Case number 19-5284, the American Council of the Blind and Patrick Sheehan Appellants, Otis Stevens v. Steven T. Mnuchin, Secretary of the Treasury, Mr. Levitky for the Appellants, Mr. Winnick for the Appellate. Mr. Levitky, good morning. Good morning, Your Honor, thank you and may it please the Court. I'd like to begin by noting that there is not a single declaration in the record of this case that states that it is impossible to add a raised tactile feature to all denominations of bills by 2026. There is not a single declaration from any official, the BEP, the Department of Justice, the Federal Reserve Board, Treasury or anyone else that makes that statement. Wait a minute, counsel, I'm not sure I understand. I thought reading the briefs that the government had indicated that they don't know how to do it at this stage. They simply do not know how to do it. That's true, Your Honor. They said that, but that doesn't mean, Your Honor, that it's impossible. The District Court found that it was impossible. Well, does it matter whether it's impossible or they simply don't know how to do it? How can we, how can we order the government to do something they don't know how to do? Well, Your Honor, first of all, to back up, this case has a very long history. It was the government's decision, not ours, to choose the raised tactile feature as their preferred method of accessibility. There are other more commonly used methods, such as changing the size of currency, etc. They could have done that, but they just said, no, we don't want to do that because it's too expensive. And now, ten years, ten years after they decided that they were going to use the raised tactile feature, all of a sudden they come up and say, we don't know how to do it. But yet, if they don't know how to do it, Your Honor, I would submit to the court, why are they saying in the status report filed with this court just yesterday, that they expect to do it by 2026? Certainly, there is some inconsistency there. Well, they're hoping they can figure out how to do it. Well, Your Honor, they didn't say they were hoping to, they said they expect to. Well, but the problem is, they don't know how to do it now. And apparently, other countries around the world are struggling with that, that effort unsuccessfully. Well, Your Honor, there's a mixed bag of opinion on that. Frankly, there are many people, including Cummins Allison, who said that they have, they manufacture the ATM machines in Canada, that are used in Canada, it's in the record, and they say it was successful. They're able to use this equipment on ATM machines, on existing banknote machinery, without a problem and without any undue expense. They're able to use the raised tactile feature. I don't see if they're able to do it. But more importantly than that, Your Honor, you know, the government's position is that they expect to do it. This is their statement. They expect to do it in 2026. And frankly, if they say they can't do it, then they're the ones who should be moving for a modification of the injunctive order, not me. The fact is, Your Honor, it's one thing to say you can't do it right now. It's not the same thing to say you can't do it in 2026. Those are two different things entirely. Your Honor, let me follow up on what you just said, because it's not clear to me that you're wrong when you say maybe the government should be filing a motion to modify the injunction. This is, as you pointed out, a case with a long history. And one of the original court holdings findings was that the blind lack meaningful access to paper currency. And our court, the DC Circuit, has agreed with that part. The DC Circuit has also said that an accommodation is required if the does not impose an undue burden. That's what the Rehabilitation Act requires, an accommodation, if it does not impose an undue burden. Our court has further said that increasing the size of the numbers on the bills and making the colors jump out more is not an undue burden. So, so far, so good. But we've also said that that alone does not provide meaningful access to the government. You, the district court, and the two panel decisions from the DC Circuit are all in agreement on those four things. Now, here's where I think it gets a little trickier. The Circuit Court has never held, I don't think, please correct me if I'm wrong, this court has never held that there is an accommodation that does not impose an undue burden, and that does provide meaningful access. And assuming that this court has not held that there is an accommodation that does not impose an undue burden and that does provide meaningful access, I'm not convinced that there is such an accommodation. And if there isn't, then the injunction ought to get modified to say that the government does not have an obligation to provide meaningful access to paper currency because there is no accommodation that can accomplish that without an undue burden. Well, Your Honor, in theory, what you say is true. The problem is it just doesn't comport with the facts of this particular case. The government hasn't even approached in making an undue burden argument. An undue burden argument would be based on cost estimates, it would be based on financial issues. There's no cost estimates in the record. It's pure guesswork to say it would be undue burdensome at this point. Well, undue burdens does not necessarily relate to cost. I know you put, you've argued that it's only cost factors that prevent the Treasury Department from hiring enough people to solve the problem. But it's not just a cost factor. There are limits, technological limits, there are people, not that many people who can provide this work. Well, Your Honor, if you are correct... That's a cost factor by itself. If you are correct, Your Honor, then why doesn't the government say that in a technically not feasible? No, they didn't. They said they don't know how to do it now. Okay, Your Honor, but that's not the same thing as this. And I just want to, you know, beg the question with you. But I just don't see how saying it's not possible, if it can't do it right at this particular second, means that it's impossible, especially in light of their continuing assertions just yesterday before this court, I'm sorry, on Wednesday before this court, when they say to you that they expect to do add an RTF to the bill by 2020, 2026. It just doesn't make sense, Your Honor, the record just doesn't add up. It just doesn't get there. Now, you know, the government could have asked in this case, they could have said, look, you know, we want to keep the record open a little bit longer to see what we can do and what we can't do. They could have said that, but no, the government said we want the decision on the existing record right now. We asked, the counsel asked the court to keep it open longer. But they didn't. They didn't. No, they wanted a decision right now on whether or not it's impossible. And they got a decision. The district court judge obliged them. Mr. Levitke. There's no evidentiary record. There's not a single declaration in the record from one government official that says they can't do it. Mr. Levitke, I've been thinking about changed circumstances. The suit was brought 18 years ago. The, if I remember right, the district court's original declaration, declaratory judgment was 2008. It might be off by a couple years. But technology with regard to how we use money, how all people use money, those with a disability and those who don't have a disability has changed. Um, I did, tried to think this morning, how many times in the last month I've used cash. And I came up with. I'm hysterical because I went through the same process. And I, I don't, I don't, I won't speak for Judge Silverman and how many times he's used cash in the last month, but, but I've used it once in the past 30, 31 days, I've used it once. Now I know that not everyone is in that situation. Not everyone can get a bank account. Not everyone can get a debit card. But bank accounts and debit cards do not have the same costs and credit requirements that credit cards do. I think your position, and I'm not saying I disagree with it. I think your position is that the Rehabilitation Act requires that so long as people who are able to see have access to paper currency, there's a federal right of access to paper currency of people who have vision problems. And I, I guess if you could elaborate on that a little bit, I'd be grateful. Again, I'm not saying I disagree with you. But I am just kind of wondering, you know, 18 years into this. Um, tell me, tell me why debit cards don't solve the problem. Well, let me, let me interrupt and say, I use cash every single day. I have a bank account. I have a credit card. I have a debit card. Go ahead. I'm not going to ask you what you're using cash for. Your honor, first of all, your honor, I'd like you to know that at this very moment, your tax dollars are being used to build a brand new currency facility in Maryland. And the reason they're building that brand new currency facility in Maryland is that the government expects that the use of cash is going to increase over the next 10 years. And that's in the record of this case. So as my position is, you know, if the government wants to move away from cash, then fine, that's fine. But they're not doing that. They intend to increase the supply of cash. That's why they're building a brand new facility at the cost of tens or hundreds of millions of dollars. I don't know what in Maryland and, and, and, and an improvement to the one in Fort Worth because they anticipate an increase in cash usage. So this is all good in terms of spec. But the real question that seems to me that Judge Walker is raising, but it may not be legitimate for us to open this up because the government hasn't argued it. But the real question is, for the hearing impaired, isn't there an easy alternative using credit cards or debit cards? Well, your honor, I agree with you. We can't really rely on that because the government hasn't said it. Right. But practical matter, isn't that true? If I, if I were blind, I would use a credit card or debit card all the time. Well, first of all, your honor, you get a few practical problems about, and these figures are in the record of the case. But I think, believe it or not, this is surprising, but it's from the Federal Reserve Board. I believe almost 60% of the people in this country, especially poor people, do not have credit cards or debit cards. We think, we all do, of course, but there are a lot of very poor people, especially poor people who are older and who are living just at the poverty line, frankly, that just don't have them. They can't get them. So I would think that, you know, before we go down that road, your honor, you'd want more information on the record here in terms of... Well, I agree with you. The government hasn't argued this. So it's not, it wouldn't be legitimate for us to consider it. But I couldn't help but agree with Judge Walker. It seemed to me this was a device. Suppose the government gave blind people or hearing impaired people a concessionary credit card or debit card. That's possible, your honor. I just don't know. It's just, you know, I could only argue what we've got in front of us. I know. I agree. I agree. The government has given these audible readers to the vision impaired, and they have very serious drawbacks. Our own colleague uses one and says that, and I'm sure this is the case with others, that when it's audible to people around that he's got a $100 bill or whatever, that's a huge security risk. And added to that is the fact that the vision impaired don't know who is around when this audible reader says whatever it says about you are handing a $100 bill or that is a $100 bill. That's an interesting point. All right. Mr. Leviticky, we'll give you a couple minutes to reply. Mr. Winnick. Good morning, your honor. May it please the court. Daniel Winnick for the government. Redesigning the currency is a monumental task, and in recognition of that fact, Judge Robertson decided in 2008 not to require the Treasury Department to undertake two separate redesigns of each note, one for accessibility and another for security. Instead, he directed the department to make each note accessible when it was next redesigned for security reasons. Counselor, let me go to the question I asked your colleague. Do you know how to do it now? Do you know how that you raise the numbers now? So I appreciate the question, your honor, because I appreciate the opportunity to clarify. What we've said is that we haven't yet completed the testing, the extensive testing required to assure ourselves that a feature will satisfy all of the criteria. But we do. We have done over the years a great deal of testing and have arrived at the point of recommending to the relevant committees any day now. And we expect that secretary will determine by the end of the year a particular application method for a tactile feature. And we have every expectation that that feature, as applied in that way, will be applied to the $10 note by 2026. So we're not throwing up our hands by any stretch of the imagination, and we're certainly not speaking out of both sides of our mouths on this. What we've said is that because this is such a difficult project, we need to finish the testing. We need to do everything required to assure ourselves. But we do have an idea that it's going to work. You have an idea that it's going to work, but you don't know at this point? We have not completed the final testing required to assure ourselves that the feature is sufficiently efficacious, that it works with all of the other security features on the redesigned note, et cetera. But we have every expectation that this is going to work, that these tests are to confirm that, and that we'll be able to implement it on the $10 note in 2026. We are by no means at the point of throwing up our hands and saying, we don't think we can do this. Then why do you object to a deadline? Simply because, I mean, a couple of points here. First, the deadline of the motion that they actually brought was to require the $10 note to be rendered accessible by the end of this year, which I think everybody agrees at this point is not possible. And to have every denomination rendered accessible by 2026. And the fundamental problem with that proposal and the primary basis of the district court's ruling is that doing that would require the department to decouple the security and accessibility redesign. So it would require the department to focus first on issuing a redesigned note in each nomination that is accessible, that has a tactile feature, and only then to do the security redesign of each note. And the effect of doing that, the record is quite clear, the effect of decoupling the redesigns and prioritizing accessibility redesign would be to delay the security redesigns. And so the primary basis of the district court's ruling was that the district court didn't think it was equitable to impose on everyone in the country, every individual, every business and law enforcement, the burden of the increased risk of counterfeiting in whatever marginal period of delay there is in order of delay of the security redesigns, so as to decouple the redesigns and do accessibility first. Well, I, wait a minute, I gather you expected if you coupled the two, you could do it by 2026. We could do it by 2026 for the $10 note. Every note is distinct, they all have distinct versions of security features, and so that's why there is a staggered rollout schedule. So you're suggesting you have no objection to an order, a modification of the injunction ordering you to provide the $10 note by 2026? Our objection to that, your honor, is based simply on the fact that as the history of this litigation has showed, there are lots of contingencies here and everything is dependent on testing, and the secretary's statutory obligation is to ensure that the notes are best protected against counterfeiting, which was the cause of the delay from 2020 to 2026. So our objection is we wouldn't want to be in the position of contempt if further developments cause a delay in that date. I don't expect that. Certainly, we continue to expect the note will be ready in 2026, but that's the only objection to putting that in a judicial order is that it becomes enforceable by contempt if there are further, you know, developments. I would note, of course, that plaintiffs haven't asked for that. That's not the modification they proposed, and the rule of case law is quite clear that the is suitably tailored to change circumstances and not to consider whether any modification of the injunction might be equitable. If plaintiffs wanted to move for relief limited to that, which is some version of what they did back in 2012, they're, of course, free to do so, and then we would be briefing and a decision and potentially another appeal from that. I did want to make sure I speak a little bit to plaintiff's accusations of bad faith, and that the district court recognized repeatedly with great familiarity with this record that the Department of the Treasury and its staff have been working in good faith to comply with the current injunction. I certainly don't deny that the process of developing a tactile feature has been frustrating for everybody involved and has taken much longer than anybody expected, but there is no basis for plaintiff's assertions of deliberate delay or deception, and again, as I noted earlier, the latest status report that we filed indicates that we are on the precipice of recommending an application method to the relevant committees. We expect the secretary will approve it by the end of the year, and we have every expectation, although subject to confirmatory testing, that it will be ready to implement on the $10 note by 2026. On feasibility, what I would say principally is that that's not the primary basis of the district court's ruling. The district court didn't say I'm not, didn't say principally I'm not ordering the department to do this, they just can't do it. The court did say that, it did offer that as an additional reason why the modification shouldn't be granted in addition to the delay to the security redesigns that it caused, but really the basis of the district court's ruling was that decoupling the security and accessibility redesigns would delay the security redesigns and thus expose all Americans, individuals, businesses, and law enforcement to the risks of increased counterfeiting in the period of delay. Mr. Winnick, you may not know the answer to this, and it's okay if you don't, but do you know if any time and any money has been spent by the treasury on deciding what person to put on the $10 or $20 bill? So, your honor, as, you know, I think public reporting has reflected, there has been, you know, I think some time spent in addressing that, and a decision was made at one point, and I honestly don't know the current status to replace one of the portraits. I want to emphasize there is no such thing as a portrait redesign independent from a security redesign. What happens is that when the currency is regularly redesigned for security reasons, other changes can be made. I understand, but part of what the American Council for the Blind is, I think, understandably frustrated with is that this suit was filed 18 years ago. They still don't have access to paper currency. The Rehabilitation Act has been interpreted to statutorily require that the Treasury Department provide them with access to paper currency. Of course, statutes also require the Treasury Department to make the currency secure from counterfeiting, and that takes time and money. Both of those things take time and money, but to my knowledge, there's not a statute that says Treasury must, as a matter of federal law, change the picture of who's on the $10 or who's on the $20 bill. So I guess my question is, why has Treasury spent time and money on who should be on the bill instead of spending that time and that money on the security features and the accessibility for the disabled community features that Treasury is statutorily required to do? I think I can safely say, Your Honor, that any time and money that has been spent on the contemplation of portraits has not delayed this timeline, and we've certainly never offered that as a reason to justify the timeline that has occurred. I agree completely with Your Honor's basic premise, which is that this has taken a long time and that some frustration is understandable. I'm not here to say that this has been a process anybody has been delighted with, but it has largely been a result of the fact, first, that developing a tactile feature has been incredibly challenging, as it has- No, I get that, Mr. Winnick, from the briefing, and I don't doubt that it's a challenge to do the tactile feature. As I said in the beginning, I'm not sure, frankly, that you're ever going to be able to do that. But you would agree with the logic, at least, that if an agency spends time and money on one thing, that means it has less time and money to spend on another thing. At a general level, I accept that logic. I think if the record doesn't remotely reflect, and I frankly don't know that there has been appreciable amounts of time and money spent on the portrait redesign, and I haven't heard any suggestion that that has caused the setback in the schedule. The delay from 2020 to 2026 happened in 2016, when the department became aware of significant new counterfeiting challenges that, in the secretary's judgment, required an additional six-year period of the security redesign in order to ensure that the redesign note would be able to address those counterfeiting risks on a forward-looking basis. It didn't occur in any way because of contemplation of portrait changes. Of course, we could modify the order by giving you a direction as to who to put on the $20 bill. I have a clear idea of who that should be, but maybe that would help the process along. I thank your honor for the suggestion. In all seriousness, again, we recognize that this department is committed to making this work in the best way that we're able. We're undertaking testing even now, as the status report reflects, to ensure that the tech-out feature that's recommended for application will be able to satisfy all the criteria and work with a secure and effective currency. We have every expectation of being able to implement that on the $10 note by 2026 and on subsequent denominations on the schedule we laid out. If there are no further questions from the court, we'd ask that the district court's denial of the motion be affirmed. Right. Thank you. Mr. Levitky, why don't you take a couple minutes? Thank you, your honor. Well, first of all, just to note that we agree with court that I believe it was Judge Walker who said that if they're going to change the portrait on the note, that then they should do make an accommodation change from the blind and visually disabled, and we've raised that point with government. Now, with respect to the issue of the delay of the security redesign, you know, if you look at the rationale for the delay of the security redesign, it's largely fictitious. They say that the delay will be due to the fact that they'll be required to add resources for the purpose of including the RTF on the legacy 2020 note by 2020. By 2020. But 2020 has come and passed. They're not going to have to divert any resources because that deadline is no longer operative. That argument is essentially mooted by subsequent events. In addition, I may also add that this is a cost-based argument. The BEP says we only have so much time to do everything. Well, then, you know, they can add more people. They can add more staff. They can add more contractors. Yes, that costs money. But notwithstanding the explicit instruction of this court remanding for additional cost estimates, they didn't give any or four denominations, whatever, by 2026 and to include the and to do the security redesign. And I may also add on that point that we beg the district court. We urge the district court. All right, your honor, we understand the government is claiming infeasibility. So, then, can't we just by 2026 at least with respect to those specific denominations for which the government made no claim of infeasibility and the district judge refused that order? And that seems to me very unreasonable. We could have obviated this entire litigation not been here had the district court just gone back to the government and said, well, what exactly denominations are you claiming are infeasible by 2026? And had they done that and had they given us something, then we wouldn't even be here today. I thought their position was that all denominations. Their positions, I'm sorry, your honor? That to decouple the security from the accessibility would affect all denominations. Well, your honor, it does affect all denominations, but the government made a claim of infeasibility here. That's what I mean. I thought their position was it is infeasible with respect to all denominations to decouple the security from the accessibility. No, no, your honor. I don't believe that. Well, that's what the district court concluded, but that's not what the government argued. What the government argued is that it is infeasible to produce all denominations with the RTF by 2026. They didn't say, though, which denominations. In other words, they said we can't do it with all denominations, but they left open the clear implication that they could do it with at least one. Less than or more than one. That all means we can't do all implies we could do less than that. Exactly. That's the intent. That's the way we read it, and the government more or less conceded in their briefing before this court that they could add the RTF to more than one denomination by 2026. All right. If there are no more questions, then gentlemen, your case is submitted. Thank you, your honor. I have one more question, Judge Henderson. I'd like to ask the government again, what is your response to the last point? Have you said all or nothing? The district court said all or nothing. What about his argument that you should be required to deal with those denominations that you can do? The response, your honor, is decoupling the security and accessibility redesigns for any denominations, and this is what the district court said, would delay the security redesigns. That's why that's our primary rationale, and it has really nothing to do with feasibility. Even if it's feasible that we do more than the $10 note, that we put the tactile feature on notes other than the $10 bill by 2026, doing that would require us to delay the security redesigns. It would expose everybody to an increased risk of counterfeiting. That's the basis on which we urge the affirmance of the district court ruling, and again, it just has nothing to do with it. Wait a minute. I thought you said you expected you would be able to do all of them by 2026. No, your honor. Will we expect- Just the $10 bill? Correct, and we expect that we'll be able to put the tactile feature on all of the other denominations on the current schedule for the security redesigns of those denominations, which runs out. It's in the briefs, one in 2028, one in 2030, and so forth. We expect that it will be feasible to put the tactile feature on all of the denominations by those dates, but what plaintiffs have fundamentally asked is that we be required to prioritize the accessibility redesign over the security redesign, and that would delay the security redesigns. The primary basis of the district court's ruling was that it wasn't equitable to impose that delay, and that's the basis on which we urge affirmance. Thank you. Can I just- I just do have one more question. On the updated timeline, Mr. Winnick, as of 2017, the last, the outside date is for the $50 bill, 2032 to 2035? I think, your honor, that it's not the 50. I think the 50 by the current schedule is actually the between 2032 and 35, and the 100 between 2034 and 2038, which is, I think, a fairly standard staggered schedule owing to the need to address the, you know, distinct security features of each note. Okay, I think it changed then from 2017. It did change a little bit, your honor. All right, thank you. Any more questions? Your honor, can I just respond briefly? Go ahead. Thank you, your honor. I would urge the court to take a very, very close look at paragraph 10. Mr. Olahar's declaration dated February 2, February 8, 2019, at page 739 of the record. The entire sum and substance of the delay claim is based on that single paragraph, and what does Mr. Olahar say? He says that any effort to pursue a fixing in delay. We're not asking anymore that they even include the RTF on the legacy $10 note. That deadline has come and passed. That deadline was set for 2020. It's not going to happen. We're not even asking this entire sum and substance of the delay claim is based on that paragraph, which is truly mooted and non-operative. All right, well, we need to call an end to these proceedings or we'll go back and forth forever. All right, gentlemen, thank you. Your case is submitted. Thank you, your honor.
judges: Henderson, Walker, Silberman